IN THE COURT OF APPEALS FOR TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 2, 2020

## IN RE COLLWYNN J.[1]

**Appeal from the Circuit Court for Bradley County**
**No. V-19-422      J. Michael Sharp, Judge**

_____

## No. E2020-00726-COA-R3-PT
_____

This appeal involves the termination of the parental rights of a mother and father to their child. The trial court found clear and convincing evidence to support two grounds for termination: persistence of conditions and severe abuse. The trial court also found that termination was in the best interests of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Berry Foster, Chattanooga, Tennessee, for the appellant, Daniel D.

Chessia A. Cox, Athens, Tennessee, for the appellant, Hannah J.

Herbert H. Slatery III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## Background

This is a termination of parental rights case. The child at issue, Collwynn[2] J. ("the Child"), was born to parents Hannah J. ("Mother") and Daniel D. ("Father") in October of

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] The Child's first name is spelled differently throughout the record. We defer to the spelling used on his birth certificate. Further, there are points in the record at which the Child is referred to as Collwynn J. and Collwynn D. Again, we defer to the name listed on the Child's birth certificate.

2018. Mother tested positive for oxycodone at the time of the Child's birth. As a result, the Department of Children's Services ("DCS") sought an ex parte order from the Juvenile Court for Bradley County ("juvenile court") allowing DCS to bring the Child into its custody. This order was entered on October 23, 2018, and the Child has been in DCS custody ever since. Important to this case, Mother and Father have four other children[3] who were removed by DCS and adjudicated dependent and neglected prior to the birth of the Child. On August 23, 2016, the juvenile court entered an order finding that Mother and Father had severely abused one of the children, Z.D., based on the fact that when he was seven months old, Z.D. tested positive for oxycodone and hydrocodone. There is no suggestion in the record that the order finding severe abuse as to Z.D. was appealed by either parent.

Between the Child's removal and February of 2019, Mother and Father exercised their visitation with the Child a handful of times; however, the issues regarding the parents' transient living situation and drug use continued. An adjudicatory hearing was held on February 5, 2019, at which Mother and Father both tested positive for oxycodone and neither parent produced a valid prescription. After the hearing, the juvenile court determined that the Child was dependent and neglected in the parents' care and that the parents were still unable to provide the Child with a safe and stable home, primarily because of drug use. The juvenile court's order also noted that there were unaddressed concerns about domestic violence between the parents. Later in February of 2019, DCS placed the Child with his maternal grandmother ("Christina D."), who lives in Palm Coast, Florida. Christina D. also has custody of two of the Child's older siblings. Neither Mother nor Father has seen the Child since February of 2019, but it is undisputed that the parents have engaged in some phone calls and video chats with Christina D. and the Child since that time.

DCS filed its petition to terminate both Mother's and Father's parental rights on August 7, 2019 in the Circuit Court for Bradley County ("trial court"). The petition alleged the ground of persistence of conditions, averring that Mother's and Father's issues with drug abuse continued and that both parents had refused the hair follicle drug tests required by DCS. The petition further alleged that Mother's and Father's living situation had not improved and that at the time the petition was filed the parents were living at a shelter in Cleveland, Tennessee. DCS also alleged the ground of severe abuse, relying on the juvenile court's previous finding regarding the Child's sibling, Z.D. Finally, DCS alleged that termination was in the Child's best interests, noting that the Child was in a pre-adoptive home with his biological siblings.

A trial was held on February 25, 2020, at which Mother, Father, Christina D., and DCS case worker Stephanie Gayle all testified. Mother and Father stipulated the statutory grounds for termination, and both acknowledged that their living situation remained

---

[3] None of the other children are at issue in this appeal.

unstable.  Mother and Father maintained, however, that termination was not in the Child's best interests because they love the Child and still desire to have a relationship with him. Mother also made allegations that Christina D. is a poor parent.  Christina D. testified, however, that the Child is happy and thriving in her home and has bonded with her family, particularly with the Child's biological siblings.

The trial court entered its final order on April 30, 2020, finding that clear and convincing evidence supported termination of Mother's and Father's parental rights to the Child pursuant to both grounds alleged.  The trial court also found that termination was in the Child's best interests.  Mother and Father both filed timely notices of appeal.

## Issues

Mother and Father both raise the single issue of whether the trial court erred in concluding that termination of their parental rights is in the best interests of the Child. Pursuant to our Supreme Court's holding in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016),[4] however, we must also determine whether the trial court properly concluded that clear and convincing evidence supports the statutory grounds for termination.  We turn first to the statutory grounds.

## Standard of Review

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

---

[4] The *Carrington H.* Court held that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."  483 S.W.3d at 525–26 (footnote omitted).

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tenn. Code Ann. section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

## I.    Grounds for Termination

In the case at bar, the trial court found that two grounds for termination existed: persistence of conditions and severe abuse.  We address each ground in turn.

### A. Persistence of Conditions

Tenn. Code Ann. section 36-1-113(g)(3)(A) explains that a person's parental rights can be terminated when:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

The purpose of the persistence of conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016).  Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (citing *In re T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)).  Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

In the present case, it is undisputed that the Child has been removed, by court order, from Mother's and Father's custody for more than six months and that the conditions

underlying the Child's removal were primarily drug exposure and the parents' transient, unstable living situation. The trial court made the following pertinent findings:

> Drug use concerns caused the [C]hild's removal from the parents in October 2018, and the parents have failed to meaningfully address those concerns. The parents tested positive for oxycodone on a urine drug screen conducted by DCS on February 5, 2019, and they failed to provide current, valid prescriptions for that substance. The parents have refused to participate in hair follicle drug testing that DCS has offered to coordinate and pay for. In addition, the parents lack a suitable home in which the [C]hild could safely reside.

> There is little chance that those conditions will be remedied at an early date so that the [C]hild can be returned to the parents in the near future. The parents have made little to no progress towards regaining custody in [the time] that the [C]hild has been in custody, as evidenced by their failure to complete permanency plan tasks. Moreover, the parents have failed to remedy these same conditions with respect to the [C]hild's 4 older siblings, who have languished in foster care for over 4 years as a result.

The record preponderates in favor of the trial court's findings, largely because Mother and Father both concede that their living situation remains tenuous, but at the same time refuse to acknowledge any issues with substance abuse. At trial, both Mother and Father testified that they were homeless for most of the time that the Child had been in DCS custody. In the two or three weeks prior to trial, they had been living in a local hotel with a friend named Gabriel. Mother could not confirm Gabriel's last name. Both parents testified that Gabriel was paying for the hotel room, but Father testified that he would contribute money for the room and groceries when possible. Before moving into the hotel with Gabriel, Mother and Father lived in a tent somewhere in the woods near Cleveland, Tennessee, in homeless shelters, or on the street. Although it is not entirely clear from the record how long Mother and Father were living in the tent, Mother testified that it was "quite awhile" and for "over a year." Father testified that he was looking for a place for himself and Mother but that it was difficult to find anything Father could afford because he subsists on $875.00 per month in disability and Mother has no income aside from food stamps. Neither Mother nor Father were sure where they would live if Gabriel moves out of the hotel or asks them to leave. Both Mother's and Father's testimony reflects that they continue to lead a transient lifestyle and are currently dependent on Gabriel to provide them with basic essentials.

With regard to the substance abuse issues, Mother admitted to testing positive for oxycodone in February of 2019 and again in October of 2019, just a few months before trial. Although Mother maintained at trial that she has always had a prescription for oxycodone, she did not produce any such prescription and claimed that she was unable to

get a copy of the prescription because her ID had been stolen. Although the record suggests that Mother has, in the past, completed some alcohol and drug counseling, Mother tested positive for oxycodone after that counseling occurred and was therefore required to complete a new assessment which was not done. Father also tested positive for oxycodone on February 5, 2019 and claimed at trial that he had a prescription for the drug. However, Ms. Gayle testified that no prescription for Father was produced, and the record does not contain anything corroborating Father's testimony. Ms. Gayle further testified that she had not heard from Father since October of 2019, or from Mother since November of 2019, and as such there were no updated drug screens for either parent.

Overall, the record reflects that Mother and Father continue to struggle with the conditions underpinning the removal of the Child from their custody, primarily stable housing and substance abuse. Moreover, it is unclear whether Mother and Father even acknowledge that they struggle with addiction, as they both maintained at trial that they are legally prescribed oxycodone. Although DCS has been involved with Mother and Father for many years, the record does not show that either parent has ever taken meaningful steps to address their issues with drugs. The testimony regarding the parents' living situation was equally troubling. Although Mother and Father testified at trial that they were living in a hotel, they had only been living there for a few weeks, and prior to that were living on the streets, in the woods, and in and out of shelters. Simply put, Mother and Father have no permanent home and no plan to acquire one.

By the same token, Mother's and Father's testimony inspires little confidence that these conditions can be remedied at all, much less in the near future. Although Mother and Father have been involved with DCS since 2015 they have made no meaningful improvement in their circumstances. Rather, with regard to addiction, these parents struggle to acknowledge the conditions that necessitated removal of the Child to begin with. Under similar circumstances, we have previously explained that a parent's refusal to acknowledge or take responsibility for their actions indicates that the conditions necessitating removal are unlikely to be remedied in the near future. *See In re Brian W.*, No. M2020-00172-COA-R3-PT, 2020 WL 6390132, at \*9 (Tenn. Ct. App. Oct. 30, 2020) (upholding termination based on persistence of conditions when parents maintained that all of their children's health issues were a result of being in foster care); *In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at \*7 (Tenn. Ct. App. Sept. 3, 2020) (noting that mother's unwillingness to accept responsibility for the conditions underpinning her child's removal from her custody was persuasive evidence that the conditions would not be remedied in the near future); *In re Briana H.*, No. M2017-02296-COA-R3-PT, 2018 WL 4191227, at \*8 (Tenn. Ct. App. Aug. 31, 2018) (same). Moreover, placing the Child in such an unstable situation would most certainly diminish the Child's chances of integration into a safe and permanent home because Mother and Father have no plan for establishing a safe, stable, permanent, and drug-free home. In contrast, the Child is currently in a stable placement with his biological siblings, and Christina D. wishes to adopt the Child.

Consequently, we agree with the trial court's conclusion that the ground of persistence of conditions was proven by clear and convincing evidence.

## B. Severe Abuse

Next, DCS alleged and the trial court found that Mother's and Father's parental rights should be terminated on the basis of severe abuse. Tenn. Code Ann. section 36-1-113(g)(4) provides for termination of parental rights when:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. section 37-1-102 defines "severe child abuse," in relevant part, as "[k]nowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child." A finding of severe abuse is *res judicata* "in a later termination of parental rights proceeding, when such a finding ha[s] been made in a previous dependency and neglect action." *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (citing *State v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995));[5] *see also In re Brian W.*, 2020 WL 6390132, at *9; *In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12–13 (Tenn. Ct. App. Aug. 20, 2020).

Here, the trial court concluded that Mother's and Father's parental rights as to the Child could be terminated pursuant to section 36-1-113(g)(4) based on the 2016 order finding that Mother and Father had severely abused the Child's sibling, Z.D., through drug exposure. We agree with the trial court's conclusion.

On August 23, 2016, an order was entered finding that Z.D. had been severely abused in Mother's and Father's care because Z.D. tested positive for oxycodone and hydrocodone, and Mother admitted to breastfeeding Z.D. while taking the drugs. *See* Tenn. Code Ann. § 37-1-102(b)(27)(E). The severe abuse finding as to Father arose from his failure to prevent Mother's actions. Nothing in the record suggests that this finding was appealed, and neither parent asserted at trial that the August 23, 2016 order is somehow

---

[5] "The doctrine of *res judicata* applies when 'an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.'" *In re Heaven L.F.*, 311 S.W.3d at 439 (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)).

nonfinal.[6] Father argues in his brief, however, that there has never been a finding of severe abuse as to the Child, and notes that the parents' other four children are not involved in the present action.[7] As such, Father appears to argue that the finding of severe abuse of Z.D. should not have had preclusive effect in the later termination proceeding as to the Child.

We are unpersuaded by Father's argument. This Court has previously held under similar circumstances that a finding of severe abuse, even when made with regard to a different child in a different action, can still be *res judicata* in a later termination proceeding as to a subsequent child. This situation was considered in a recent case. *See In re Trinity H.*, No. M2020-00440-COA-R3-PT, 2020 WL 5110312 (Tenn. Ct. App. Aug. 28, 2020). In that case, a juvenile court found that a father committed severe abuse against two children "stemming from [f]ather's failure to protect these children from drug exposure while their mother was pregnant[.]" *Id.* at *1. The order in which this finding was made was entered in March of 2019. *Id.* However, the child actually at issue, Trinity, was not born until June of 2019. *Id.* The child tested positive for drugs at birth and was removed into DCS custody; later, in November of 2019, the child was adjudicated dependent and neglected "due to her drug exposure and [f]ather's lack of housing." *Id.* The opinion does not suggest that there was a severe abuse finding in the dependency and neglect stage as to the father and Trinity.

Nonetheless, DCS filed a petition to terminate the father's parental rights as to Trinity and alleged severe abuse pursuant to section 36-1-113(g)(4) as a ground. *Id.* The trial court relied on the March 2019 severe abuse finding in concluding that DCS proved this ground:

> The State has submitted a certified copy of the decree in the case involving [father's other children]. That is exhibit number nine filed on March 1, 2019. That order stated that the Court finds by clear and convincing evidence that [father's other children] are victims of sever[e] child abuse as defined by Tenn. Code Ann. § 37-1-102. It goes on more specifically and sets out that the children tested positive for various drugs and finds that [f]ather made admissions that he knew that the mother was using opiates. Therefore, the order clearly establishes that [f]ather committed severe child

---

[6] Father asserts in his brief that the termination proceeding regarding the other siblings is not final because that case is also on appeal in this Court. While this may be true, the pertinent issue is not whether the separate termination proceeding is complete, but rather whether the underlying order entered on August 23, 2016 is final. *See In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) ("[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed following the dependency and neglect hearing." (citing *In re Karisah N.*, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at *10 (Tenn. Ct. App. Nov. 27, 2018))). Again, there is nothing in the record suggesting either parent ever appealed the 2016 order, nor did either parent argue at trial that the 2016 order is nonfinal.

[7] Mother concedes that this ground was proven at trial.

abuse upon two other children that are siblings to the child in question. So the Court finds that ground is established by clear and convincing evidence.

*Id.* at \*3.

On appeal, we upheld the trial court's decision, explaining that the doctrine of *res judicata* prevented re-litigation of whether the father committed severe child abuse against Trinity. *Id.* at \*10. Consequently, the father's parental rights to Trinity were terminated by virtue of section 36-1-113(g)(4), notwithstanding the fact that there had never been a finding of severe abuse by the father as to that child. *Id.* This result is not an aberration. *See, e.g.*, *In re Hayden L.*, No. E2018-00147-COA-R3-PT, 2018 WL 4190986, at \*9 (Tenn. Ct. App. Aug. 31, 2018) (upholding termination of a mother's parental rights as to her son in 2017 by applying preclusive effect to a 2011 order finding severe abuse, arising from in utero drug exposure, as to a different child); *In re Gabriel C.*, No. E2017-02398-COA-R3-PT, 2018 WL 4182293, at \*5 (Tenn. Ct. App. Aug. 30, 2018) (upholding the termination of a mother's parental rights to her son pursuant to section 36-1-113(g)(4), based on a previous severe abuse finding that addressed the son's half-sister and was made two years before the son's birth).

The present case is analogous to *In re Trinity H.* and similar cases. Further, the plain language of section 36-1-113(g)(4) makes clear that a parent's rights can be terminated when the parent "has been found to have committed severe child abuse . . . against **any child**." (emphasis added). The import of the statute is clear, and it is not of consequence that the severe abuse finding as to Z.D. was made in a separate action; indeed, the statute suggests just the opposite in the sense that it is satisfied when "the parent or guardian has been found to have committed severe child abuse . . . under **any prior order** of a court." Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added).

The salient facts here are that Mother, Father, and DCS were parties to a previous action in which, after a hearing on the merits, Mother and Father were determined to have committed severe abuse against a child. Tenn. Code Ann. § 36-1-113(g)(4). Neither parent appealed that finding. The trial court therefore correctly concluded that the issue of whether Mother and Father committed "severe child abuse against any child" was *res judicata*. *See id.*; *In re Trinity H.*, 2020 WL 5110312, at \*10. The termination of Mother's and Father's parental rights pursuant to section 36-1-113(g)(4) is therefore affirmed.[8]

---

[8] We acknowledge that this application of section 36-1-113(g)(4) could have harsh results under some circumstances. Indeed, section 36-1-113(g)(4) creates the possibility of a "one strike you're out" situation in which a parent who has a child removed from their custody for severe abuse faces the possibility of termination of their rights as to another child many years later, even if a severe abuse finding as to the subsequent child is never made and no other grounds for termination are proven. This path presents a slippery slope, especially in light of the fundamental rights at stake in termination proceedings. *See In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) ("Few consequences of judicial action are so grave as the severance of natural family ties." (citing *Santosky v. Kramer*, 455 U.S. 745, 759 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982))). Nonetheless, the language of section 36-1-113(g)(4) is clear and unambiguous, and

## II.     Best Interests

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests.  Tenn. Code Ann. § 36-1-113(c).  Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)).  Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.*  As such, the focus of the best interests analysis is not the parent but rather the child.  *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

Tenn. Code Ann. section 36-1-113(i) provides nine factors for analyzing best interests:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

---

our role "in statutory interpretation is to assign a statute the full effect of the legislative intent without restricting or expanding its intended scope." *Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016).  We do not "substitute [our] own policy judgments for those of the legislature[,]" and we will not do so here.  *Id.* (citing *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000)).

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005)).

In the present case, the trial court concluded that the best interest factors weigh in favor of termination of both Mother's and Father's parental rights. We agree with the trial court's conclusion. Turning to the factors, Mother and Father essentially concede that they have not made an adjustment in their circumstances, conduct, and conditions because they admit they are still without stable housing and have no concrete plan for obtaining same. Tenn. Code Ann. § 36-1-113(i)(1). Further, Mother and Father both continue to resist the notion that they have a substance abuse problem, despite the fact that they have now had five children removed from their custody primarily due to drug exposure. *Id.*; *see also id.* § 36-1-113(i)(7).

In that vein, it does not appear that a lasting adjustment in Mother's and Father's circumstances is likely because these parents have been involved with DCS for several years and have taken essentially no steps towards meaningfully improving their situation. *Id.* § 36-1-113(i)(2). Ms. Gayle testified that she has attempted to help Mother get into transitional housing several times but that, overall, Mother and Father are difficult to maintain contact with and resistant to Ms. Gayle's efforts. Father testified that he does not like Ms. Gayle and has "trust issues" with her, and confirmed that he has not contacted her in several months. Ms. Gayle also testified that she had not heard from either parent for several months leading up to trial. Nonetheless, Ms. Gayle testified that she coordinated a

phone call and video chat schedule for the parents and the Child, and had even discussed with Mother the possibility of helping her relocate to Florida so as to be closer to the Child. Mother testified that she did not follow up on this idea because she did not want to live in a women's shelter in Florida. Ms. Gayle also testified regarding attempting to facilitate visitation with Mother and Father by providing them a gas card to visit the Child; however, when Ms. Gayle looked into providing the parents with a gas card, she discovered she was prohibited from doing so because Mother and Father had been provided a gas card previously and did not use it on gas. Overall, Ms. Gayle's testimony reflects that although she aided Mother and Father to the best of her abilities, Mother and Father refused to meet Ms. Gayle halfway. In light of the fact that Mother and Father essentially refuse to work with Ms. Gayle and have made little if any progress on their permanency plan requirements, it is unlikely that a lasting adjustment is possible here, even with the efforts of DCS. *Id.*

Mother and Father did exercise some visitation with the Child while he was in Tennessee, and Christina D. testified that there have been some video chats and phone calls since the Child has been in Florida. *Id.* § 36-1-113(i)(3). Considering the substantial distance between the parents and the Child as well as the parents' limited means, we cannot find that the lack of in-person visitation with the Child is entirely the fault of the parents. *Id.* However, the parents visited the Child only a handful of times when the Child lived in Tennessee, and Mother refused Ms. Gayle's attempts to assist Mother in potentially relocating to Florida. As such, we conclude that factor three does not favor any party more than the other under these circumstances.

Both parents admit that they have essentially no relationship with the Child, although they posit that a relationship would be easier to maintain if the Child had not been moved to Florida. *Id.* § 36-1-113(i)(4). Again, we find it difficult to weigh this factor entirely against Mother and Father in light of the fact that DCS chose to move the Child so far away, knowing that it would be difficult for Mother and Father to visit. Nonetheless, the record also shows that Ms. Gayle made efforts to facilitate a relationship between the parents and the Child, but had difficulty maintaining contact with Mother and Father and gaining their cooperation. As such, we cannot conclude that factor four weighs heavily in favor of any party. *Id.*

Factors five and six, however, militate heavily in favor of termination in this case because the Child had been in the custody of Christina D. for a year by the time of trial, and Christina D. testified that the Child was well adjusted in her home and bonded to the family. In particular, Christina D. testified that the Child is bonded to his brothers that also live in the home, as well as another young grandchild that Christina D. often helps care for. Two of the Child's aunts also live with Christina D., and the Child enjoys doing activities with the entire family. Christina D. and Ms. Gayle both testified that the Child is happy, healthy, and has no significant issues. It stands to reason that the Child would suffer emotionally, psychologically, and possibly medically, if he were removed from his current

placement. *Id*. § 36-1-113(i)(5). Indeed, the record reflects that the Child would be at a significant risk for homelessness and drug exposure if returned to Mother's and Father's custody. *Id.*; *see also id.* § 36-1-113(i)(6). Mother's and Father's refusal to acknowledge their issues with substance abuse and their failure to take meaningful steps towards addressing these issues leads us to believe both parents would likely be unable to care for the Child in a safe and stable manner, and also raises concerns regarding the parents' mental and/or emotional status. *Id.*; *see also id.* § 36-1-113(i)(7) & (8). Finally, Mother and Father have not paid support for the Child since he has been in Christina D.'s custody, and Christina D. testified that she has not received any gifts from either parent. *Id*. § 36-1-113(i)(9). Accordingly, factor nine also militates in favor of termination.

Considering the foregoing, we conclude that clear and convincing evidence supports the trial court's finding that termination of Mother's and Father's parental rights is in the Child's best interests.

## **Conclusion**

We affirm the ruling of the trial court in all respects. This case is remanded for any further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed one-half to the appellant, Daniel D., and one-half to the appellant, Hannah J.

_____
KRISTI M. DAVIS, JUDGE